**BERGER & MONTAGUE, P.C.**
Daniel R. Miller (PA Bar No. 68141)
William H. Ellerbe (NJ Bar No. 179952015)
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dmiller@bm.net
Email: wellerbe@bm.net

*Attorneys for Relator*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF NEW JERSEY *ex rel.* JAYANT BARAI, <br><br> Plaintiffs, <br><br> v. <br><br> PRINCETON PATHOLOGY SERVICES, P.A. and MARIO S. GONZALEZ, M.D. <br><br> Defendants. | CASE NO.:_____ <br><br> **COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.*, AND THE NEW JERSEY FALSE CLAIMS ACT, N.J. REV. STAT. § 2A:32C-1 *ET SEQ.*** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (1986, AS AMENDED)** <br><br> **JURY TRIAL DEMANDED** |

Table of Contents

I.    SUMMARY OF THE ACTION ................................................................................. 1

II.   THE PARTIES ....................................................................................................... 3

III.  JURISDICTION AND VENUE ............................................................................. 5

IV.   APPLICABLE LAW ............................................................................................. 6

    A.   The False Claims Act ................................................................................... 6

    B.   Claims Submission and Certifications ......................................................... 8

V.    THE FALSE CLAIMS ........................................................................................ 11

    A.   TEG Tests and Related Services ................................................................ 11

    B.   False Claims for Services That Were Not Performed for Relator ................ 12

    C.   False Claims for Services That Were Not Performed for Pedro S. .............. 15

    D.   False Claims for Services That Were Note Performed for Popatlal Kabria ..... 20

VI.   CMS DATA SHOWS THAT DEFENDANTS' BILLING FOR TEG-RELATED
       SERVICES INCREASED PRECIPITOUSLY IN 2014 ........................................ 22

VII.  DEFENDANTS SUBMITS THE FALSE CLAIMS KNOWINGLY ................................ 24

VIII. DEFENDANTS KNOWINGLY FAIL TO REPORT AND RETURN OVERPAYMENTS
       TO THE GOVERNMENT .................................................................................. 25

IX.   DEFENDANTS' FALSE CLAIMS CAUSED INJURY AND DAMAGES TO THE
       GOVERNMENT ............................................................................................... 26

X.    COUNTS ........................................................................................................... 27

    A.   Count I, Violation of 31 U.S.C. § 3729(a)(1)(A) ........................................ 27

    B.   Count II, Violation of 31 U.S.C. § 3729(a)(1)(B) ....................................... 27

    C.   Count III, Violation of 31 U.S.C. § 3729(a)(1)(G) ..................................... 28

    D.   Count IV, Violation of N.J. Rev. Stat. § 2A:32C-3 ..................................... 28

XI.   PRAYER FOR RELIEF ...................................................................................... 29

XII.  DEMAND FOR JURY TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE
      38(B) .............................................................................................................. 30

Dr. Jayant Barai ("Relator"), on behalf of the United States of America and the State of New Jersey ("New Jersey" or the "State"), brings this action against Princeton Pathology Services, P.A. ("PPS") and Dr. Mario S. Gonzalez ("Dr. Gonzalez") (collectively, "Defendants") for violations of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, and the New Jersey False Claims Act, N.J. Rev. Stat. § 2A:32C-1 *et seq.*, to recover all damages, civil penalties, and all other recoveries.

I.      **SUMMARY OF THE ACTION**

1.      Princeton Pathology Services, P.A. and its owner, Dr. Mario S. Gonzalez, have for many years submitted false claims for reimbursement for medical services that they did not perform, that no treating physician ordered, and that would have been medically unnecessary had they been performed, to Medicare, New Jersey's Medicaid program, TRICARE, the Veteran's Administration, and other federally and state funded health care programs ("Government Payers").

2.      Defendants' basic fraud scheme is to bill Government Payers for services related to the administration of Throboelastrogram ("TEG") tests, even though such tests are not performed on the patients.

3.      Additionally, in many instances, there is absolutely no medical necessity for performing a TEG test on the patients, as TEG tests are typically only performed on patients who are scheduled to receive open heart or brain surgery.  Defendants routinely bill Government Payers for TEG-related services performed on patients who are not scheduled to receive those services.

1

4.      Further, Defendants bill multiple times for TEG-related services in the span of several days, or even on the same day, despite an utter lack of medical necessity for performing multiple TEG tests in such a short time span.

5.      Relator is a medical doctor who has been practicing medicine in New Jersey for over 30 years.  One of the hospitals where Relator has admitting privileges is St. Michael's Medical Center ("St. Michael's") in Newark, New Jersey.  Dr. Gonzalez is the Chief of the Laboratory Pathology Department at St. Michael's.

6.      Though Relator was aware of Dr. Gonzalez because he is the head of the Laboratory Pathology Department at St. Michael's, Relator has had no direct or professional interaction with Dr. Gonzalez.

7.      Relator became aware of Defendants' fraud scheme when he himself went to the emergency room of St. Michael's as a patient for personal medical attention on December 19, 2015.  Relator went to St. Michael's on an emergency basis and not for a scheduled surgery, so a TEG-test was not indicated.  Moreover, Relator's treating physician did not order a TEG test.  Finally, Relator did not undergo a TEG test.  Nonetheless, Defendants billed Relator's insurance carrier for $122 worth of services related to two TEG tests that they did not perform.

8.      After receiving the invoice for these claims, Relator became suspicious of Defendants.  After further investigation as detailed below, Relator concluded that Defendants had submitted similar false claims to Government Payers with regard to at least two of Relator's patients.

9.      One of these patients was admitted at St. Michael's.  Relator was the treating physician.  This patient is insured through Medicare.  Defendants submitted at least 10 different claims to Medicare for TEG-related services for this one patient, totaling $1,220 in false claims

2

from August 13, 2015 to September 4, 2015.  However, Defendants did not perform any of these tests.  *See infra*, ¶¶ 72–79.

10.     As outlined in further detail below, Defendants have been engaged in this scheme for many years, and Relator can confirm that the fraud has cost Government Payers millions of dollars.

## II.     **THE PARTIES**

11.     The United States is a plaintiff in this action, which it brings on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded healthcare programs, including Medicare, Medicaid, TRICARE, and the Veterans Administration.

12.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ggg; 42 U.S.C. §§ 426 and 426A, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. Medicare is a government health insurance program for people age 65 or older, certain disabled people under age 65, and people of all ages with end stage renal disease.  The Medicare Program is comprised of four parts; Medicare Parts A through D.

13.     Part A of the Medicare program authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care.

14.     Medicare Part B, which is particularly relevant to the allegations raised herein, authorizes payment for physician and ancillary services, including laboratory and diagnostic tests and procedures. Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. CMS contracts with private insurance companies to administer, process, and pay Part B claims from the Federal Supplementary

3

Medical Insurance Trust Fund. The private insurance companies that contract with CMS to provide these services are called Part B Carriers.

15.     Part C of the Medicare program is also known as Medicare Advantage. Medicare Advantage Plans stand in place of Medicare Parts A and B and are offered by private companies approved by Medicare. These plans are typically less expensive for the consumer, but limit covered beneficiaries to a network of covered providers.

16.     Medicare Part D provides prescription drug coverage for Medicare beneficiaries.

17.     TRICARE is a federally funded program providing medical benefits to military personnel, their families, retired veterans, and reservists called to duty. *See* 32 C.F.R. § 19 *et seq*.

18.     The Veterans Administration is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

19.     Medicaid is a government health insurance program funded jointly by the Federal and state governments. *See* 42 U.S.C. § 1396 *et seq*.  Each state administers its own Medicaid program.  However, each state program is governed by federal statutes, regulations and guidelines.  The federal portion of each state's Medicaid payment – the Federal Medical Assistance Percentage – is based on that state's per capita income compared to the national average. During the relevant time period, the Federal Medical Assistance Percentage was between approximately 50% and 80%.

20.     The State of New Jersey is a plaintiff in this action. PPS is located in Princeton, New Jersey.  Dr. Gonzalez is the Chief of Laboratory Pathology at St. Michael's in Newark, New Jersey.  Upon information and belief, the majority of the patients who receive treatment at St. Michael's and whose insurance carriers are billed for fraudulent services by Defendants are

New Jersey citizens, and a portion of those patients are insured through New Jersey's Medicaid program.

21.     Relator Dr. Jayant Barai is a citizen of the United States and a resident of New Jersey.  Relator is licensed by the State of New Jersey, and he has been practicing medicine in New Jersey for 30 years.

22.     Defendant PPS is a privately owned medical services provider.  Dr. Gonzalez is the President of PPS.  PPS's National Provider Identifier ("NPI") is 1710009626.  According to the NPI registry database, PPS's mailing address is 8 Players Lane, Princeton, NJ 08540-2236, and its primary practice address is 111 Central Avenue, Newark NJ 07102-1909, which is also the address of St. Michael's Hospital in Newark.

23.      Defendant Dr. Mario S. Gonzalez is the President of PPS and the Chief of Laboratory Pathology at St. Michael's.  Dr. Gonzalez's NPIs are 1952414476 and 1942498985. Dr. Gonzalez also has affiliations at University Hospital in Newark, New Jersey, St. Barnabas Medical Center in Livingston, New Jersey, New Jersey, and Maimonides Medical Center, NYU Langone Medical Center, NYU Langone Hospital, The Mount Sinai Hospital, and NewYork-Presbyterian Hospital in New York, New York.  As the President of PPS, Dr. Gonzalez is responsible for its billing practices.

## III.    JURISDICTION AND VENUE

24.     Subject matter jurisdiction is founded upon the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

25.     Venue in the District of New Jersey is appropriate under 31 U.S.C. § 3723(a) in that, at all times material to this civil action, Defendants transacted business in the District of

5

New Jersey, or submitted or caused the submission of false claims in the District of New Jersey. Although such issue is no longer jurisdictional under the 2010 amendments to the Act, to Relator's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e). Moreover, whether or not such a disclosure has occurred, Relator would qualify under that section of the Act as an "original source" of the allegations in this Complaint. Before filing this action, Relator voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without his knowledge.

26.     This Court further has supplemental jurisdiction as to claims by the State of New Jersey against Defendants for violations of the New Jersey False Claims Act (the "New Jersey FCA"), N.J. Rev. Stat. § 2A:32C-1 *et seq*., pursuant to 28 U.S.C. § 1367, as those claims are related to the federal claims in that they form part of the same case and controversy under Article III of the United States Constitution and as further contemplated by 31 U.S.C. § 3732(b).

## IV.     APPLICABLE LAW

### A.     The False Claims Act

27.     The federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. §§ 3729(a)(1)(A)–(B).

6

28.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§ 3729(b)(1)(A)(i)–(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

29.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. §§ 3729(b)(2)(A)(i)–(ii).

30.     "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

31.     The New Jersey FCA is modeled after the FCA, and it contains provisions similar to those quoted above.  Relator asserts claims under the New Jersey FCA for the state portion of Medicaid false claims detailed in this Complaint.

32.     Services provided to Medicare and other federal health care program beneficiaries are only reimbursable if they are medically necessary. *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of

illness or injury or to improve the functioning of a malformed body member"); 42 C.F.R.

§ 411.15(k)(1).  That is, Medicare and other federal health care programs only cover medical

services that are "reasonable and necessary for the diagnosis or treatment of illness or injury."

*Id.*; *see Strand Analytical Labs, LLC v. Burwell*, 2015 WL 4603258, at *15 (S.D. Ind. July 30,

2015) (court upheld denial of coverage for defendant lab's test because it was not reasonable and

necessary for the diagnosis or treatment of an illness).

33.     Accordingly, providers may only submit claims for government healthcare

reimbursement for "reasonable and necessary" medical services.

**B.     <u>Claims Submission and Certifications</u>**

34.     Each time a claim for payment is submitted to the government, a provider

expressly certifies that the services performed were medically justified and the claim otherwise

complies with applicable rules and regulations.

35.     Providers submit claims to Medicare for reimbursement for medical services and

equipment by using CMS Form 1500.  Most claims are filed electronically.  The claim form has

different numbered fields that the provider must fill in such as the patient's name, address,

insured's I.D. number, referring physician's name and patient's diagnosis.

36.     When submitting claims on CMS Form 1500, providers indicate the type of

service provided to a Medicare or Medicaid beneficiary using a code known as a Healthcare

Common Procedure Coding System ("HCPCS") code, which are sometimes referred to by their

private practice counterpart, Current Procedural Terminology ("CPT") codes. *See generally* 45

C.F.R. § 162.1002; *United States ex rel. Sikkenga  Regence Bluecross Blueshield of Utah*, 472

F.3d 702, 709 n.9 (10th Cir. 2006) ("CPT codes refer to 'Current Procedural Technology' codes,

which describe medical services such as treatments, tests, and procedures, and are an accepted means of reporting such medical services to government and health insurance programs.").

37.     CPT codes are published annually by the American Medical Association ("AMA") in a "CPT Manual," and are composed of a five digit numeric codes (which sometimes include a numeric modifier) used to describe procedures, services and supplies.  CMS has adopted the AMA's CPT coding system as part of its HCPCS coding system.  *See Aetna Health Inc. v. Carolina Analgesic, Inc.*, No. CV 13-7202 (NLH/AMD), 2016 WL 3410178, at *2 (D.N.J. June 16, 2016).

38.     Form 1500 requires the provider to list all CPT/HCPCS codes for the medical services for which the physician is seeking reimbursement (field number 24D on the claim form).

39.     When submitting claims on CMS Form 1500, providers also must provide their national provider identifier ("NPI") number, which is a "standard unique health identifier for health care providers." 45 CFR § 162.406; *see United States v. Gonzalez*, 560 F. App'x 554, 556 (6th Cir. 2014) (describing NPI as "unique identifiers issued by the [CMS] to healthcare providers").

40.     The provider must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.

41.     These certifications include the following relevant statements:

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)**

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information

9

required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section.

CMS Form 1500.

42.     Thus, the form specifically contains a "medical necessity" certification and a certification that the claim complies with all applicable rules and regulations.

43.     Also, the provider must certify that all the information on the form is true, accurate, and complete.

44.     In addition to these express certifications and representations, when submitting claims for government reimbursement, providers impliedly certify that the underlying services were medically necessary and otherwise comply with applicable rules and regulations. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) ("[T]hrough the act of submitting a claim, [providers] knowingly and falsely implied that [they were] entitled to payment."); *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300 (E.D. Pa. 2017) ("Under the theory of implied false certification, when a defendant submits a claim to the government, it impliedly certifies compliance with all conditions of payment").

45.     Knowingly causing the submission of claims that are ineligible for payment under a federal health care program constitutes a violation of the FCA. *See United States ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 152–53 (D. Mass. 2001) (knowingly causing the

submission of claims that are ineligible for reimbursement can serve as a basis for liability under the FCA); *see also United States ex rel. Nowak v. Medtronic, Inc.*, Case Nos. 1:08-cv-10368 and 09-cv-11625 (D. Mass.) (United States' Statement of Interest, at 6)("[t]o the extent that a healthcare provider seeks reimbursement for a procedure that is ineligible for payment under a federal healthcare program . . . because the program places other conditions on coverage that are not satisfied, the claim is false").

46.    Thus, each time a claim for payment is submitted to a federal healthcare program, the provider expressly certifies that the services performed were medically justified.  In addition, each time a provider submits a claim, the provider impliedly certifies that the service was provided in accordance with federal and state statutes, regulations, and program rules

47.    When submitting CMS Form 1500, providers also expressly certify that the service is medically necessary.  In this regard, the form 1500 signed by the provider states: "I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

48.    Consequently, a submitting provider who does not personally provide services or personally direct the provision of services may not submit a claim for reimbursement.

## V.    **THE FALSE CLAIMS**

### A.    **TEG Tests and Related Services**

49.    A TEG test is a test that is performed on a patient's blood to determine the coagulation efficiency of the patient's blood, which is also referred to as the "thinness" of the blood.

11

50.     Many patients who have coronary disease will take a drug to lower the coagulation efficiency of their blood to prevent heart attacks.  These drugs are often referred to as "blood thinners" and include drugs like aspirin, Plavix, Brilinta, and Effient.

51.     If a patient who is regularly taking a blood thinner is scheduled to undergo surgery, that patient's physician will typically instruct the patient to stop taking the blood thinner to prevent bleeding problems during and after the surgery.

52.     In the case of a patient who is taking a blood thinner and who is scheduled to undergo open heart or brain surgery soon, the patient's physician may also order a TEG test before the surgery is performed to test whether the patient's blood is too thin or not.

53.     A TEG test is typically only performed before a surgery, and it is typically only administered once before surgery (though it may be repeated a day later if the first test produced an abnormal result).

54.     There are several CPT codes for procedures related to TEG tests, including 85347, 85384, 85390, and 85576.

55.     Additionally, physicians who order TEG tests to be performed will sometimes submit a separate claim for the interpretation and report of the TEG test by adding "-26" or a similar modifier to the CPT code for the test.  For instance, a claim for CPT code 85390-26 would be a claim for the interpretation and report of a fibrinolysins or coagulopathy screen (which is a TEG-related test).  By using a modifier, the physician bills a separate claim from the administration of the test and will be paid an additional amount on that claim.

B.     **False Claims for Services That Were Not Performed for Relator**

56.     On December 19, 2015, Relator went to the emergency room at St. Michael's for personal medical treatment because he was experiencing shortness of breath.

12

57.     Relator was examined by Dr. Sam Matthews.  At no time did Dr. Gonzalez act as one of Relator's treating physicians.

58.     The medical team at St. Michael's determined that there was no cause for concern, and they discharged Relator a few hours after his arrival.

59.     Relator went to St. Michael's on an emergency basis, *i.e.*, he was not scheduled to undergo surgery at the time of his admission.

60.     Nor did Relator's medical team schedule Relator to undergo surgery as a result of his admission to St. Michael's on December 19, 2015.

61.     While Relator was in the emergency room, a nurse drew blood from him and sent it to the Laboratory Pathology Department.  Dr. Gonzalez is the head of this Department.

62.     The Laboratory Pathology Department is supposed to: a) only perform the tests that the treating physician has ordered, and b) transmit the results of the test back to the treating physician for evaluation.

63.     Dr. Matthews ordered several test to be performed on Relator's blood, and the Laboratory Pathology Department performed those tests.  None of the tests ordered by Dr. Matthews was a TEG test.

64.     The evidence shows that PPS is the entity that bills for work supposedly performed (but not actually performed) by Dr. Gonzalez.

65.     For example, on December 24, 2015, St. Michael's sent Relator an invoice for the tests allegedly performed on December 19, 2015.  That invoice was paid by Relator's insurance carrier.

66.     In February 2016, Relator received another invoice for tests supposedly performed on December 19, 2015.  This invoice was sent by PPS for six charges totally $217,

including two TEG tests that were supposedly performed on December 19, 2015.  No such tests were indicated, ordered, or performed.

67.     The image below is an electronic depiction of the invoice containing the bogus TEG bills.



68.     When Relator received an Explanation of Benefits ("EOB") from his insurance carrier several days later, the EOB showed that Dr. Gonzalez was the (alleged) provider of the services for which PPS had invoiced Relator:

14

<table>
<thead>
<tr><th colspan="3">Explanation of Benefits<br>THIS IS NOT A BILL</th><th colspan="8">Page 3 of 3</th></tr>
</thead>
</table>

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Member: ███ | | Patient: ███ | | | Provider of Services: MARIO GONZALEZ MD | | | | | |
| Member No: ███ | | Account No: ███ | | | Provider No: 203100683-006     Claim No:0028343476 | | | | | |

| | | HRINJ Discounts | | Paid By Other Insurance | Your Responsibility | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Service | Description of Service | Amount Billed | Provider Discount | Ineligible | | Deductible Applied | CoPay/ Coinsurance | Max Fee Excluded | Amount Member Pays | Amount Paid to Provider | Notes |
| 12/19/15 | Laboratory | 122.00 | 48.80 | 0.00 | 0.00 | 0.00 | 21.56 | 0.00 | 21.56 | 51.24 | |
| 12/19/15 | Laboratory | 25.00 | 10.00 | 0.00 | 0.00 | 0.00 | 4.50 | 0.00 | 4.50 | 10.50 | |
| 12/19/15 | Laboratory | 20.00 | 8.00 | 0.00 | 0.00 | 0.00 | 3.60 | 0.00 | 3.60 | 8.40 | |
| 12/19/15 | Laboratory | 20.00 | 8.00 | 0.00 | 0.00 | 0.00 | 3.60 | 0.00 | 3.60 | 8.40 | |
| 12/19/15 | Laboratory | 30.00 | 12.00 | 0.00 | 0.00 | 0.00 | 5.40 | 0.00 | 5.40 | 12.60 | |
| | Claim Totals | 217.00 | 86.80 | 0.00 | 0.00 | 0.00 | 39.06 | 0.00 | 39.06 | 91.14 | |

HRINJ Paid to Provider:   91.14
Total Amount Member Pays:   39.06

69.     Relator does not take blood thinners.  Relator was also not scheduled to undergo surgery when he went to the St. Michael's emergency room on December 19, 2015.  Therefore, there was no medical reason in the least for performing even one of the TEG-related services that Defendants claimed they performed for Relator, let alone two.

70.     After receiving the invoice from PPS and the EOB from his insurance carrier, Relator reviewed his medical records from his December 19, 2015 visit to the emergency room. Those records do not show that anyone—either Dr. Matthews or Dr. Gonzalez—actually ordering the TEG-related tests and services that Defendants claimed on their invoice.  These same records also do not show that any of those services were actually performed.

71.     In sum, Defendants billed Relator (and his insurance carrier) for two claims totaling $122 that were not medically necessary, were not ordered by physician, and were not actually performed.

**C.     False Claims for Services That Were Not Performed for Patient P.S.**

72.     After Relator received the false invoices from Defendants and investigated his medical records, he was approached by his patient P. S. about a similar issue that Mr. S. experienced with receiving invoices from Defendants.

15

73.     Mr. S. has coronary disease, and he was admitted to St. Michael's on August 13, 2015 for treatment related to coronary issues he was experiencing.

74.     Relator was Mr. S.'s treating and admitting physician on August 13, 2015. Relator continue to see Mr. S. and act as one of his treating physicians for the week that he was at St. Michael's after his initial admission and until he was discharged on August 20, 2015. During this time, Mr. S. had a Coronary Artery Bypass surgery.

75.     Mr. S. was readmitted from August 24, 2015 to August 28, 2015, and then again from August 30, 2015 until September 4, 2015, for post-operative complications.  Relator continued to serve as one of Mr. S.'s treating physicians during both of these periods.

76.     During these three periods that Mr. S. was at St. Michael's, there was only one time that one of his physicians ordered a TEG test for him.  Specifically, on August 14, 2015, his surgical team ordered a TEG test in anticipation of the Coronary Artergy Bypass surgery that he was scheduled to undergo that day.

77.     That August 14th TEG test performed on the day of his heart surgery was the only instance where one of Mr. S.'s treating physicians actually ordered a TEG test for him. Moreover, because Mr. S. only had one surgery during the time he was at St. Michael's in August and September of 2015, the only time a TEG test would have been medically necessary for him was on August 14th, as he was scheduled to have surgery that day.

78.     Still, Defendants invoiced and billed Mr. S. and his insurance carrier, Medicare, for ten (10) TEG-related services that were supposedly performed on August 13, 15, 16, 17, 19, 24, 25, and 29 and September 3 and 4, respectively.

16

## August 13 – August 19, 2015
Mario Gonzalez, MD, (973)877-5200
PO Box 5977, New York, NY 10087-5977
Referred by ▮▮▮▮▮▮▮▮

| Service Provided & Billing Code | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| **August 13, 2015/Dr. Gonzalez, Mario S., M.D.** | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | $122.00 | $41.12 | $32.24 | $8.22 | k |

Claim #02-15239-057-260                                                                    (continued)

## August 13 – August 19, 2015/Mario Gonzalez, MD continued...

| Service Provided & Billing Code | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| **August 15, 2015/Dr. Gonzalez, Mario S., M.D.** | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | m |
| **August 16, 2015/Dr. Gonzalez, Mario S., M.D.** | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | m |
| **August 17, 2015/Dr. Gonzalez, Mario S., M.D.** | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | m |
| **August 19, 2015/Dr. Gonzalez, Mario S., M.D.** | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | m |
| **Total for Claim #02-15239-057-260** | | $610.00 | $205.60 | $161.20 | $41.10 | n |

## August 24 – August 25, 2015
**Mario Gonzalez, MD, (973)877-5200**
PO Box 5977, New York, NY 10087-5977
Referred by Srulowitz, Allen

| Service Provided & Billing Code | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Below |
|---|---|---|---|---|---|---|
| August 24, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | $122.00 | $41.12 | $32.24 | $8.22 | O |
| August 25, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | O |
| **Total for Claim #02-15251-614-900** | | $244.00 | $82.24 | $64.48 | $16.44 | P |

## August 29, 2015
**Mario Gonzalez, MD, (973)877-5200**
PO Box 5977, New York, NY 10087-5977
Referred by Guerrero, Fernando

| Service Provided & Billing Code | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | $122.00 | $41.12 | $32.24 | $8.22 | |
| **Total for Claim #02-15254-093-940** | | $122.00 | $41.12 | $32.24 | $8.22 | C |

### August 30 - September 04, 2015
Mario Gonzalez, MD, (973)877-5200
PO Box 5977, New York, NY 10087-5977
Referred by Guerrero, Fernando

| Service Provided & Billing Code | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| August 30, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Red blood cells, leukocytes reduced, each unit (P9016) | NO | $30.00 | $0.00 | $0.00 | $0.00 | k |
| September 03, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | l |
| Claim #02-15254-093-960 | | | | | (continued) | |

| August 30 - September 04, 2015 continued... | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| Service Provided & Billing Code | | | | | | |
| Red blood cells, leukocytes reduced, each unit (P9016) | NO | 30.00 | 0.00 | 0.00 | 0.00 | l |
| September 04, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | m |
| Total for Claim #02-15254-093-960 | | $304.00 | $82.24 | $64.48 | $16.44 | n |

79.     For each these 10 fraudulent claims, Defendants billed Mr. S. and his Medicare

plan $122, totalling $1,220 in false claims for services that were not medically necessary, that

were not ordered by the treating physician, and which were not performed.  Relator, as one of

Mr. S.'s treating physicians during each of the three times he was at St. Michael's during this

period, was able to review Mr. S.'s medical records.  Those records show that none of these

services were performed.

**D.**     **False Claims for Services That Were Note Performed for P. K.**

80.     Another patient of Relator's who was falsely invoiced by Defendants for TEG-related services that were not ordered, not needed, and not provided is P. K.

81.     Mr. K. has acute coronary disease.  Because of this disease, Mr. K. was scheduled to undergo Triple Coronary Bypass on August 6, 2015.

82.     In anticipation of that surgery, one of Mr. K.'s treating physicians ordered a TEG test on August 5, 2015, the day before the surgery.

83.     That single TEG test on August 5 is the only time that such a service was medically necessary for Mr. K.  It was also the only time that one of Mr. K.'s physicians ordered such a test.

84.     However, Mr. K.'s EOB from his time at St. Michael's in August, 2015 shows that Dr. Gonzalez billed him and his Medicare plan four times for TEG-related services:

THIS IS NOT A BILL [Page 1 of 3]

## August 05 – August 07, 2015
Mario Gonzalez, MD, (973)877-5200
PO Box 5977, New York, NY 10087-5977
Referred by Barai, Jayant H

| Service Provided & Billing Code | Service Approved? | Amount Provider Charged | Medicare-Approved Amount | Amount Medicare Paid | Maximum You May Be Billed | See Notes Below |
|---|---|---|---|---|---|---|
| August 05, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | NO | $183.00 | $0.00 | $0.00 | $0.00 | Q,R |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 61.00 | 20.56 | 16.12 | 4.11 | S |
| August 06, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | S |
| August 07, 2015/Dr. Gonzalez, Mario S., M.D. | | | | | | |
| Coagulation function screening test with interpretation and report (85390-26) professional charge | Yes | 122.00 | 41.12 | 32.24 | 8.22 | S |
| **Total for Claim #09-15236-633-410** | | $488.00 | $102.80 | $80.60 | $20.55 | T |

85.     Though one of the charges on August 5 is potentially justified (if it corresponds with the actual TEG test ordered and performed for Mr. K. in anticipation of his surgery), the EOB establishes that Defendants billed Mr. K. and his Medicare plan for extra TEG-related services on August 5 and wholly unjustified services on August 6 and 7.

86.     Moreover, as one of Mr. K.'s treating physician, Relator knows that none of Mr. K.'s treating physicians ordered these extraneous TEG-related services, and that there was no medical necessity for those services.

87.     Relator also knows that these extraneous services were not actually provided to Mr. K. because he checked the medical records for Mr. K.

## VI.    CMS DATA SHOWS THAT DEFENDANTS' BILLING FOR TEG-RELATED SERVICES INCREASED PRECIPITOUSLY BEGINNING IN 2014

88.      CMS makes data regarding claims made to Medicare Part B available through its website.[1]

89.      These data sets do not include any years besides 2012–2016 at the present time, nor do they include any claims to other government payers such as Medicaid or TRICARE, or insurance plans under Medicare Part C.

90.      Nonetheless, the trends of Defendants' fraud scheme are obvious in the data sets that are available, as is demonstrated in the following chart:

| Year | # of Claims for HCPCS 85390 | # of Beneficiaries for HCPCS 85390 | # of Claims for all Codes Except 85390 | Total Amount Paid for HCPCS 85390 Claims | Total Medicare Part B Payments |
|------|------|------|------|------|------|
| 2012 | 351 | 282 | 1,681 | $5,818 | $47,769 |
| 2013 | 1,204 | 515 | 931 | $20,588 | $37,047 |
| 2014 | 23,094 | 5,095 | 960 | $384,003 | $401,466 |
| 2015 | 25,408 | 4,734 | 634 | $410,943 | $421,505 |
| 2016 | 6,875 | 1,958 | 421 | $103,562 | $109,993 |

91.      The data shows that, in 2012 Dr. Gonzalez submitted claims for 351 TEG tests (under HCPCS code 85390) performed for 282 patients covered by Medicare B, and he received $5,818 in payments from Medicare for those claims.  Notably, this amount does not reflect the

---

[1] At this time, the only years for which data is available are 2012–2016.  There is a different website available for each year.  The data for 2012 can be found at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier2012.html.  The data for 2013 can be found at https://data.cms.gov/Medicare-Physician-Supplier/Medicare-Provider-Utilization-and-Payment-Data-Phy/din4-7td8.  The data for 2014 can be found at https://data.cms.gov/Medicare-Physician-Supplier/Medicare-Provider-Utilization-and-Payment-Data-Phy/ee7f-sh97.  The data for 2015 is available at https://data.cms.gov/Medicare-Physician-Supplier/Medicare-Provider-Utilization-and-Payment-Data-Phy/sk9b-znav.  The data for 2016 can be found at https://data.cms.gov/Medicare-Physician-Supplier/Medicare-Provider-Utilization-and-Payment-Data-Phy/utc4-f9xp.  The data for Dr. Gonzalez appears under his NPI number 1952414476.

amount Defendants billed Medicare—instead, it reflects how much Medicare actually paid to Defendants.

92.     In 2013, Dr. Gonzalez submitted 1,204 claims for TEG tests for 515 Medicare Part B patients, and he received $37,047 in payments from Medicare for those claims.

93.     In 2014, Dr. Gonzalez submitted 23,094 claims for TEG tests performed for 5,095 patients—a staggering increase in TEG claims of 1,818.1% relative to 2013.

94.     Dr. Gonzalez was also paid $401,466 by Medicare in 2014 for TEG claims—an increase of 983.7% relative to the amount he was paid in 2013.

95.     This increase held steady in 2015, as Dr. Gonzalez billed for 25,408 TEG claims and received $421,505 in payments from Medicare for those claims.

96.     In 2016, Dr. Gonzalez' total Medicare billing went down, as he only submitted 421 non-TEG claims (which is less than half of the number of non-TEG claims he submitted in 2013).[2]  Even still, Dr. Gonzalez submitted claims for 6,875 TEG procedures in 2016 and received $103,562 from Medicare for those claims.

97.     The data show the vast majority of the payments Dr. Gonzalez received in 2013–2016 were for claims made for TEG tests— a total of $919,096, which is 94.75% of the total of $970,011 he received from Medicare Part B alone during that four year period.

98.     In contrast, in 2012, Dr. Gonzalez only received $5,818 (or 12.18%) of his total $47,769 from Medicare Part B claims from TEG tests.

99.     Relator is not aware of any material changes to Dr. Gonzalez's job responsibilities, patient population, or the standard of care for physicians in Dr. Gonzalez's field

---

[2] The data for 2016 only became available recently, so it is possible that more claims will be added in future revisions to the data.

of practice that would explain the dramatic rise in the number of TEG related procedures Dr. Gonzalez billed for between 2012–13 and 2014–16.

## VII.   DEFENDANTS KNOWINGLY SUBMITTED FALSE CLAIMS

100.    As discussed above in Section V, Defendants' fraudulent schemes is to make express false claims for services that no physician ordered, that were not medically necessary, and that did not actually happen.  There can be no doubt that Defendants knew that they were submitting false claims, as they knew that had not actually provided the services they were presenting claims for and that no treating physician had ordered those services.

101.    As seen above in Section V, Defendants submitted invoices for false claims to patients who had other, legitimate lab work done in the Laboratory Pathology Department of St. Michael's, where Dr. Gonzalez was the Chief of the Department.

102.    Defendants thereby caused false claims to be submitted to the target patients' insurance carriers, whether they had private insurance, as Relator had, or whether they were enrolled in a government health care program such as Medicare, as Mr. S. and Mr. K. were.

103.    The EOBs for Mr. S. and Mr. K. show that Defendants were paid by those patients' Medicare plans.

104.    Dr. Gonzalez is aware of this scheme because: (1) he is listed as the provider of the fraudulent services; (2) he is the President of PPS, which submitted the invoices and received payments for the fraudulent services; and (3) he is the Chief of the Laboratory Pathology Department at St. Michael's, which is the Department at St. Michael's from which these false claims came.

105.    PPS is aware of this scheme because: (1) Dr. Gonzalez is the President of PPS; (2) PPS submits the invoices for the false services; and (3) PPS receives the payments for the false services.

## VIII.  DEFENDANTS KNOWINGLY FAIL TO REPORT AND RETURN OVERPAYMENTS TO THE GOVERNMENT

106.    Since March 23, 2010, 42 USC §1320a-7k(d) has required that a person receiving an overpayment must, within 60 days of identifying an overpayment, report and return the money and notify Medicare of the reason for the overpayment.  The 2010 amendments to the Medicare Act specifically made the failure to report and return overpayments enforceable under the False Claims Act (31 USC §3729(b)(3)) and applies the same broad definitions of "knowing" and "knowingly" as the FCA. *See* Section 1128J, as added March 23, 2010 by P.L. 111-148, Title VI, Subtitle E, §6402(a), 124 Stat. 753.

107.    Once a party becomes aware of an overpayment or a possibility of an overpayment, the party has an affirmative duty to investigate further the possibility that an overpayment occurred and, if an overpayment did occur, to notify and to repay the government.

108.    Because Defendants submitted claims for services that were not actually performed, Defendants were on notice that that the government had overpaid Defendants every time Defendants received a payment for a false claim.

109.    Defendants were therefore required, at minimum, to undertake an investigation of these abusive practices and to report and to repay the overpayments.  Defendants had an obligation to do so, within the definition of 31 U.S.C. § 3729(A)(1)(G).  Instead, as detailed above, Defendants continued to submit false claims and refused to even consider returning any

overpayments because the explicit and intentional purpose of submitting the false claims was to bring in overpayments.

110.    Defendants thus knowingly concealed their obligation to repay government monies, and improperly avoided their said obligation, within the meaning of 31 U.S.C. § 3729(A)(1)(G).

## IX.    DEFENDANTS' FALSE CLAIMS CAUSED INJURY AND DAMAGES TO THE GOVERNMENT

111.    Because Defendants presented its claims identified in Section V above ("the subject claims" and "the subject false claims") for payment, the federal government paid out monies on those claims to the State of New Jersey and directly to Defendants.  The State of New Jersey then paid out monies on the subject claims made for services invoiced to patients with insurance through Medicaid.

112.    Because the subject claims were false, the federal government and the State of Jersey incurred injury and damages due to the payment of the subject claims, which were overpayments.

113.    Because the Defendants knowingly did not report or repay the said overpayments, and concealed them by not doing so, the federal government incurred injury and damages.

114.    But for the Defendants' misrepresentations and concealments regarding the subject false claims, the federal government and the State of New Jersey would not have incurred the injury and damages it incurred due to the payment of the subject false claims.

X.    <u>COUNTS</u>

A.    <u>Count I, Violation of 31 U.S.C. § 3729(a)(1)(A)</u>

115.    Relator repeats and re-alleges each and every allegation contained Paragraphs 1–114, inclusive, as though fully set forth herein.

116.    Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval. Defendants caused the State of New Jersey to submit false and inflated claims to the United States for the federal portion of Medicaid when it submitted false claims in violation of 31 U.S.C. §3729(a)(1)(A).  Defendants directly submitted false and inflated claims to the United States through Medicare, TRICARE, and other government payers when it submitted false claims in violation of 31 U.S.C. §3729(a)(1)(A).

117.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has incurred actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

B.    <u>Count II, Violation of 31 U.S.C. § 3729(a)(1)(B)</u>

118.    Relator repeats and re-alleges each and every allegation contained Paragraphs 1–117, inclusive, as though fully set forth herein.

119.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government.  Defendants' false records or statements on claims submissions caused the State of New Jeresy to submit false and inflated claims to the United States for the federal portion of Medicaid in violation of 31 U.S.C. §3729(a)(1)(B).  Defendants' false records or statements on claims submissions to Medicare, TRICARE, and other government payers caused the submission of false and inflated claims to the United States in violation of 31 U.S.C. §3729(a)(1)(B)

120.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**C.      Count III, Violation of 31 U.S.C. § 3729(a)(1)(G)**

121.    Relator repeats and re-alleges each and every allegation contained Paragraphs 1–120, inclusive, as though fully set forth herein.

122.    Defendants knowingly made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the government and/or knowingly conceals, avoids, decreases, concealed, avoided, and/or decreased an obligation to pay or transmit money to the government in violation of 31 U.S.C. §3729(a)(1)(G), when it did not return funds obtained from the federal government derived from false claims.

123.    By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**D.      Count IV, Violation of N.J. Rev. Stat. § 2A:32C-3**

124.    Relator repeats and re-alleges each and every allegation contained in Paragraphs 1–123, inclusive, as though fully set forth herein.

125.    In violation of N.J. Rev. Stat**. §** 2A:32C-3, Defendants knowingly presents or causes to be presented false and fraudulent claims for payment under the State's medical assistance program, knowingly uses false records to get false claims for payment approved by the State of New Jersey under the State's medical assistance program, and knowingly creates false records to conceal an obligation to pay money to the State's medical assistance program.

126.     By virtue of the false and fraudulent claims that Defendants caused to be presented, the State of New Jersey has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## XI.     **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States and the State of New Jersey, demands that judgment by entered in their favor and against Defendant Princeton Pathology Services, P.A. and Defendant Dr. Mario S. Gonzalez for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes, with respect to the federal False Claims Act, three times the amount of damages to the federal government plus civil penalties of no more than Twenty Two Thousand Three Hundred Sixty Three Dollars ($22,363.00) and no less than Eleven Thousand One Hundred Eighty One Dollars ($11,181.00) for each false claim, and any other recoveries or relief provided for under the federal False Claims Act.[3]

This Request also includes, with respect to the New Jersey statute cited above, the maximum damages permitted by that statute and the maximum fine or penalty permitted by that statute, and any other recoveries or relief provided for under that statute.

Further, Relator requests that he receive the maximum amount permitted by the law of the proceeds of this action or settlement of this action collected by the United States and the

---

[3] Pursuant to the federal Civil Penalties Inflation Adjustment Act of 1990 and 64 Fed. Reg. 47099, 47103 (Sept. 29, 1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. *See* 28 C.F.R. § 85.3.

Pursuant to the Bipartisan Budget Act of 2015 and 83 Fed. Reg. 3944 (Jan. 29, 2018), the civil monetary penalties under the FCA were adjusted to $11,181 to $22,363 for violations occurring on or after November 2, 2015. *See* 28 C.F.R. § 85.5.

State of New Jersey, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## XII.   DEMAND FOR JURY TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(B)

A jury trial is demanded in this case.

Daniel R. Miller
William H. Ellerbe
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dmiller@bm.net
Email: wellerbe@bm.net

*Attorneys for Relator*

Date: July 17, 2018

30